## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID L. GREEN,                    :        CIVIL ACTION
                    Plaintiff,     :
                                   :
        v.                         :        NO.   08-140
                                   :
DR. DONALD C. WINTER,              :
                    Defendant.     :

### MEMORANDUM

BUCKWALTER, S. J.                                    September 24, 2009

Presently before this Court are two Motions for Summary Judgment.  Defendant Donald Winter first filed a Motion for Summary Judgment, Plaintiff David Green subsequently filed a Motion for Summary Judgment, and Winter filed a Cross-Motion for Summary Judgment.  For the reasons discussed below, Winter's Motion for Summary Judgement is granted, Green's Motion for Summary Judgment is denied, and Winter's Cross-Motion for Summary Judgment is dismissed.

## I.    FACTUAL BACKGROUND

### A.    David Green's Complaint

David Green filed his Complaint alleging that his employer, the United States Navy, violated his civil rights.  See Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.  (Compl. ¶ 4.)  Specifically, Green raises two claims: (1) that he was discriminated against because of his race; and (2) he was discriminated against in retaliation for his filing Equal Employment Opportunity ("EEO") grievances.  (Id. ¶ 13.)

Prior to his 2006 termination, Green worked for almost twenty years as an accountant for the Navy at the Naval Inventory Control Point ("NAVCIP") in Philadelphia.  (Id. ¶ 8.)  Prior to his termination "[i]n 2005, the Navy issued a Notice of Proposed Removal ("NOPR") against plaintiff and subsequently suspended him from employment for 14 days."  (Id. ¶ 9.)  Green notes that while the Navy claims to have suspended him because he violated the Navy's Transportation Incentive Program ("TIP") – the Navy's fringe benefit program providing assistance to naval employees using public transportation – he asserts that he was actually punished "because of his race" as "the Navy subjected him to adverse treatment that was much more severe than the Navy's treatment of similarly situated white employees."   (Compl. ¶¶ 10 & 11); (see also Winter's Mot. Summ. J., Ex. 18, Description of Navy's Transportation Incentive Program.)

Green's first count alleges that "after he returned to work, in October of 2005, [he] filed an EEO Complaint asserting that . . . the Navy had discriminated against him on account of his race."  (Id. ¶ 12.)  Additionally, the Navy "[i]n retaliation against [him] for filing this employment discrimination charged and in discrimination against him on account of his race, plaintiff's employer took several more adverse actions against" him. (Id. ¶ 13.)

Green avers that the Navy's discriminatory and retaliatory actions included:

> (1) the Navy's involuntary transfer of plaintiff, an accountant, to a non-accounting position in the Inventory Accuracy Department, (2) the June 30, 2600 issuance of an NOPR against plaintiff, (3) the placement of plaintiff on an administrative leave of 30 days, and (4) the Navy's firing of plaintiff on August 21, 2006.

(Id. ¶ 14.)

Reading Green's Complaint, this Court is unable to discern where his discriminatory claims end and his retaliatory claims begin.  The Navy, out of an abundance of caution, twice

analyzed each of these four, discrete instances — once as a race discrimination claim and once as

a retaliation claim.  (Winter's Mot. Summ. J. 3 n.2.)  Green disagrees with this approach and, in

his response to Winter's Motion for Summary Judgment states that:

> [i]f defendant had paid attention to the Complaint and accurately
> summarized plaintiff's action, defendant would have noted that
> plaintiff was complaining about defendant's racial discrimination
> against him in connection with false charges related to
> Transportation Incentive Program ("TIP") and retaliation against
> him in connection with (1) Navy's December 11, 2005 transfer of
> Green from the material accounting department to the inventory
> accuracy department; (2) the Navy's June 30, 2006 issuance of a
> notice of proposed removal; (3) the Navy's placement of Green on
> administrative leave for thirty days starting on June 30, 2006; and
> (4) the Navy's August 31, 2006 termination of Green's
> employment.

(Green's Resp. Winter's Mot. Summ. J. 2.)  It appears that Green believes that his punishment

for abusing the TIPS program constituted racial discrimination, and that the Navy's four

subsequent actions constituted retaliation for his prior EEO filings.  Out of an abundance of

caution, this Court will examine his punishment for violating TIP as a racial discrimination claim

and the four subsequent action as both instances of racial discrimination and retaliation.

Green currently seeks to recover for damages including: "loss of earnings, severe mental

and emotional distress, great diminution of the enjoyment of the pleasures of life, great harm to

his reputation, and a great embarrassment and humiliation."  (Compl. ¶ 20.)

## B.    More Detailed Factual Background

For the bulk of his career with the Navy, Green performed his work at a level that was

"acceptable."  (Winter's Mot. Summ. J., Ex. 13, Decision on Proposed Suspension ¶ 6.)  This

changed in 2004.  In a September 20, 2004 "Notice of Proposed Suspension," Ronald Stein noted

that Green "had no prior discipline" before his nearly monthly-long unexcused absence from

work in June 2004.  (Id. at ¶ 5.)  While noting that his was Green's first offense, Stein noted that

> your record is outweighed by the fact that, even though you were
> well aware of the rules and regulations, you were absent from the
> worksite for almost a month and provided no explanation.  Even
> though you were in receipt of a notice of proposed suspension, you
> continued to disregard the leave regulations.

(Id. ¶ 6.)  Examining the entirety of the record, Stein determined that Green's actions warranted a

two-day suspension.  (Id.)  Green's failure to follow the Navy's leave policy marked an

inauspicious ending to his government service as it was the first of three formal disciplinary

infractions, the subsequent two being for: (1) fraudulent certification of funds; and (2) failure to

follow the Navy's leave policy and repeated insubordination.  (Winter's Mot. Summ. J. 5.)  Each

time he was cited for an policy infraction, Green was reminded that compliance with naval policy

was expected.  (See id., Ex. 13, Decision on Proposed Suspension 3) ("In the future, I expect that

you will schedule your annual leave usage in advance via an SF-71 and obtain your supervisor's

approval."); (id., Ex. 14, September 18, 2005 Notice of Proposed Removal USAO0149) ("this

Naval activity has established rules that you will abide by and that any future failure on your part

to follow rules, or regulations, or directions, will be cause for more severe corrective action up to

and including your removal from Federal Service.").)

As noted previously, Green's second violation of naval policy was based upon his abuse

of the Navy's Transportation Incentive Program.  (Winter's Mot. Summ. J., Ex. 14, Decision on

Proposed Removal.)  On September 18, 2005, Captain Thomas Wiechelt, the Deputy

Commander for Aviation, issued a "Decision on Proposed Removal" which addressed a proposal

to fire Green for a first offense of abusing Transportation Incentive Program (TIP)."  (Id. at ¶ 1.)

The Decision examined both allegations and evidence suggesting that Green violated the TIP by accepting a mass-transportation subsidy while regularly driving to work and the contrary arguments made both by Green and his counsel.  It concluded that, "you [Green] have ignored warnings about making 'false, fictitious or fraudulent certification' in conjunction with your TIP application and your quarterly subsidy distributions and . . . you did not live up to your responsibilities as you certified you would."  (Id. ¶¶ 2(a),(b), & 4(a) .)

Captain Wiechelt noted that Green's prior two-day suspension, "may not have convinced" him "that further serious conduct infractions might lead to your removal from the federal service. However, please make no mistake about the clarity of the warning I am sending to you today." (Id. at ¶ 4(b).)  Captain Wiechelt noted that "I have decided to mitigate the proposed penalty of removal to a penalty of suspension for (14) calendar days.  I believe that my decision for the penalty of a (14) fourteen calendar suspension is necessary in light of your position and your callous reaction to these infractions."  (Id. at ¶ 4(c).)  As a result, Green was suspended from September 19 through October 2, 2005, returning to work on October 3, 2005.  (Id. at ¶ 5.)

Shortly after returning to work in October 2005, Comptroller Directorate Margaret Klein proposed to Capt. James Davis that Green be transferred from an accounting position in the material accounting department to an accounting position in the inventory accuracy organization. (Winter's Mot. Summ. J. 8, Ex. 17, Reassignment of David Green.)  This move was made as a result of internal naval needs as well as in response to Green's abuse of TIP.  Specifically, the Navy needed to fill a position requiring "a skilled accountant with a background in the Inventory Data Base Analysis Division," and it was eliminating the billet occupied by Green.  (Id., Ex. 17, Reassignment of David Green.)  Green's transfer was also predicated upon his improper use of

5

the TIP program, as his "failure to exercise appropriate fiduciary discretion in using this benefit for its intended purpose" made it "inappropriate to allow Mr. Green to certify funds" as he had been doing.  (Id.)  Green's new position had the same job series, grade, rate of pay, and benefits without loss of career advancement or opportunities.  (Id.)

On June 30, 2006, Green's immediate supervisor Richard Dembowski, Deputy Director of the Inventory Accuracy Division, issued Notice of Proposed Removal based upon Green's: (1) second unauthorized absence from work; (2) second offense of failing to follow leave instructions; (3) first offense of failing to follow supervisor's directions; and (4) first offense of demonstrating disrespect to a supervisor's authority.  (Winter's Mot. Summ. J., Ex. 23, Notice of Proposed Removal.)

The Notice meticulously addressed each instance of Green's alleged misconduct after his transfer to the Inventory Accuracy Division, culminating in Dembowski's recommendation that Green be terminated from federal service:

- January 20, 2006 (approx. 1500 hours): Green allegedly walked out of a required meeting, exclaimed to Dembowski "you are harassing me" and "physically threatening me," and was recorded as Absent Without Leave (AWOL) as he left the building without being granted permission to do so.  (Id., Ex. 23, Notice of Proposed Removal 1.)

- January 20, 2006 (approx. 1530 hours): Green called Naval Support Activity (NSA) security stating that his supervisor loses his time sheets and yells at him.  (Id. at 2.)  Green also reportedly contacted the Philadelphia Police Department.  Green told security that there was no physical contact.  Dembowski concluded that "[i]t was wholly inappropriate to raise those concerns before the very security agents who represent a vital organization having the responsibility for the protection of the entire Naval compound against life threatening breaches of security."  (Id.)

- February 10, 2006 (approx. 1440 hours): While discussing a leave request with Dembowski Green "became visibly upset over being asked questions and became very loud and disruptive."  (Id.)  Green got up to leave and was instructed by his supervisor "to

sit back down" and explain his "thinking regarding [the] leave request." (Id.)  Instead, he walked out of the office leaving work for the day.

• March 9, 2006 (approx. 0900 hours): Green refused to meet with Dembowski for required work performance counseling.  Green stated that he would not attend the meeting absent representation.  When informed that the meeting was mandatory and that he was "not entitled to have representation at work," Green responded that he "'would take it under advisement.'" (Id. at 3.)

• March 16, 2006 (approx. 0900 hours) and March 20, 2006 (approx. 1410 hours): Dembowski instructed Green to address deficiencies in his work product.  Instead, Green listed tasks he would prefer to do instead of his assigned project.  "Green repeatedly failed to follow [] instructions." (Id.)

• March 17, 2006 (approx 0800 hours): Green called Dembowski stating that he was not coming to work and was taking annual leave for the day.  During the call, Green was informed that "annual leave needs to be requested and approved in advance," and that his unscheduled annual leave request was not going to be approved. (Id.)  At that time, Green hung up on Dembowski.  Subsequently, Green claimed that he was absent because he needed to have urgent car repairs made, but Dembowski found these statements "lacking in specific details and as such were not convincing as to the necessity of your absence." (Id.)  Dembowski asked for "documentation to substantiate the urgency" for his absence from work. (Id.)  Green failed to produce any documentation even after several reminders, and was recorded as AWOL.

• May 4, 2006 (approx. 0900 hours): After discussing Green's leave requests, Dembowski sought "a private discussion" with him.  Green ignored Dembowski's requests and his annual leave forms were returned to him unresolved.

• May 10, 2006 (approx. 0835 hours): Green arrived thirty-five minutes late for mandatory training.  At that time, Green requested "that annual leave be granted," but his request was denied and he was recorded as thirty-five minutes AWOL. (Id. at 4.)

• May 11, 2006 (approx. 1415 hours): Green refused to meet with Dembowski for his mandatory performance appraisal.  Dembowski noted that Green "stood at my door with a distant stare . . . and in a loud agitated manner started chanting loudly, 'I rebuke you in the name of Jesus!'" (Id.)

• May 11, 2006 (approx. 1432 hours): Green again called Naval Security claiming that Dembowski "was either a security and/or police concern" due to his alleged hollering, finger pointing, and door slamming. (Id.)

- May 22, 2006 (approx. 1410 hours): Green walked out of a mandatory meeting with Dembowski about leave and attendance policy. Green requested an immediate grant of leave which was denied. Green left the building for roughly one hour, and upon returning refused to meet with Dembowski to conclude their prior meeting and discuss his absence. (Id. at 5.)

- June 14, 2006 (approx. 0915 hours): Green walked out of a required meeting with Dembowski. Again, Dembowski directed Green to return. Green refused to do so unless Dembowski said "please." (Id.) Because of his absence from the meeting, Dembowski listed Green as AWOL and sent Green an email confirming this status. Dembowski also provided Green with a hard copy of the email. Upon receiving this email, Green "crushed the memo into a ball and threw it into the trashcan with a quick and exaggerated motion." (Id.) Green turned to Dembowski and "smiled defiantly" before leaving his workstation for the remainder of the day. (Id.) Green was listed as AWOL for seven-and-a-half hours.

- June 28, 2006 (approx. 1035 hours): Dembowski called a disciplinary meeting with Green and Ronald Switzer, a Employee and Labor Relations Specialist. (Id. at 6.) The meeting was scheduled for 1000 hours, but Green, although at work, refused to attend. Eventually, he entered the meeting at 1035 hours. Dembowski started the meeting, but Green interrupted saying "'slow down(!)' or 'what was that against(!)' or 'say that again(!)'." (Id. at 2(a).) After reviewing Green's "history of misconduct" since his reassignment to the unit, Dembowski noted Green's "ongoing refusal to recognize lawful authority or accept direction." (Id. at 2(b).) Dembowski stated that he was proposing Green's removal from federal service based on a clear and convincing record of refusing to follow the rules, regulations and lawful orders of your employer." (Id.)

The genesis of Green's Complaint begins with his July 15, 2006, Formal Complaint of Discrimination, which alleges that upon returning from his fourteen-day suspension, he was retaliated against for 'speaking out about the injustice" he faced at NAVCIP. (Winter's Mot. Summ. J., Ex. 7, Formal EEO Complaint.) Specifically, Green asserts that he was retaliated against for

> speaking out about the injustice I faced at NAVCIP, upon my return to work on 10/3/2005, I exercised my right and filed EEO Complaint 10/12/2005, and the retaliation and harassment began, and intensified (From 10/2005 through 7/14/2006). For exercising my rights, Captain James Davis involuntarily re-assigned me to P015 effective 12/11/2005. In retaliation and filing my EEO

8

> complaint Mr. Ronald Switzer and Mr. Richard Dembowski took
> adverse actions against me.  On June 30, 2006, Richard
> Dembowski issue NOPR in which he made several false
> accusation.  He also place me on administrative leave for 30 days,
> and prohibited me from coming to my place of employment.  After
> Dembowski issued this NOPR, Mr. Ronald Switzer and Captain
> James Davis took steps designed to prevent me from having a fair
> opportunity to reply to Mr. Dembowski NOPR.

(Id.)

Shortly thereafter, on August 31, 2006, Captain James Davis, Comptroller, issued a

Decision on Proposed Removal, concluding that, "I find that removing you from employment

will promote the efficiency of the service." (Winter's Mot. Summ. J., Ex 15, Decision on

Proposed Removal.)  Captain Davis' Decision evaluated Green's allegations that the Notice of

Proposed Removal contained "'many false statements.'"  Davis concluded that the Notice

> contains very specific and serious specifications that are supported
> by written documentation on the record.  Your assertion that many
> of these statements are false does not identify which of the
> statements you claim to be false or provide your version of the
> events.  Similarly, your summary denial of the charges does not
> provide any alternative explanation for the events described in the
> proposal notice, nor have you offered any evidence to support your
> challenges of the charges.

(Id. ¶ 6(a).)  Davis noted Green's two prior suspensions remarking that, "[o]ne incident of failure

to follow direct orders from your supervisor would be discouraging to me.  However, the pattern

that you have repeated by your failure to follow orders and by your demonstrated disrespect for

your supervisor's authority is unacceptable and cannot be tolerated."  (Id. at 6(c).)  Further,

Captain Davis noted that,

> [a]s a grade eleven Accountant, you hold a professional position
> with fiduciary responsibilities and significant prominence within
> the NAVCIP command.  Your repeated pattern of failure to follow

9

the directions of your supervisor and your displays of disrespect for
his authority lead me to believe that you cannot contribute
effectively to the NAVCIP's mission.  Allowing your conduct to
continue would be irresponsible.  I found that some of your
incidents of defiance were witnessed by other employees in your
department and that constitutes an exacerbating circumstance.
Such disobedience threatens to seriously undermine your
supervisor's authority.

(Id. ¶ 6(c).)

On September 8, 2006, Green Filed a formal Equal Employment Opportunity ("EEO")

complaint with the Navy's EEO office. (Winter's Mot. Summ. J., Ex. 8, Formal EEO

Complaint.)  This Complaint was largely identical to his July 15, 2006, Complaint with an

additional amendment stating that: "[d]isregarding his own conflict of interest, which should

have kept him from making any decision, Captain Davis fired me on 8/31/2006.  He did so in

retaliation against me and in a shameful attempt to hinder my efforts to pursue my race

discrimination and retaliation case before the EEOC."  (Id.)

## II.    LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.

R. CIV. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For there to be a "genuine" issue, a

reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  (Id.)

On summary judgment, it is not the court's role to weigh the disputed evidence and

decide which is more probative, or to make credibility determinations.  Boyle v. County of

10

Allegheny, PA, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v.

Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow

Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987)).  If a conflict arises between the evidence

presented by both sides, the court must accept as true the allegations of the non-moving party,

and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine

issue of material fact, it need not "support its motion with affidavits or other similar materials

negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet

its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving

party's claims."  (Id. at 325).  Once the movant has carried its initial burden, the opposing party

"must do more than simply show that there is some metaphysical doubt as to material facts."

Matsushita Elec., 475 U.S. at 586.  "There must be sufficient evidence for a jury to return a

verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly

probative, summary judgment should be granted.  Arbruster v. Unisys Corp., 32 F.3d 768, 777

(3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Center, 190

F.3d 231 (3d Cir. 1999).

## III.    ANALYSIS

### A.    Winter's Motion for Summary Judgment

Reading Green's Complaint it is not clear which events he claims give rise racial discrimination claims and which support his retaliation claims.[1]  Accordingly, the Court must analyze five different events: (1) Green's claim that punishment regarding the TIPS program constituted racial discrimination; (2) the Navy's December 11, 2005 transfer of Green from the material accounting department to the inventory accuracy department; (3) the Navy's June 30, 2006 issuance of a notice of proposed removal; (4) the Navy's placement of Green on administrative leave for thirty days starting on June 30, 2006; and (5) the Navy's August 31, 2006 termination of Green's employment.  (Id.)  The Court addresses claim (1) as a racial discrimination claim.  Out of an abundance of caution, this Court will follow the Navy's lead analyzing claims (2)-(5) as both discrimination and retaliation claims.

      1.      **Analysis of Green's Racial Discrimination Claims**

           a.      **There is no Evidence that Green's Punishment for Abusing the TIP was due to Racial Discrimination**

Green was suspended for fourteen days because of his improper use of the TIP program whereby he received transit subsidies in excess of what he actually used.  He asserts that the Navy's treatment of "white employees was markedly different" from his.  (Green's Mot. Summ. J. 10; Green's Resp. Winter's Mot. Summ. J. 4.)  In fact, he notes that Captain Green "never disciplined a white employee at NAVCIP on false charges of wrongdoing; according to M. Klein, plaintiff was the only employee issued a notice of proposed removal for alleged violations of TIP."  (Id.)  Further, "no whites were disciplined for alleged violations of TIP and the discipline

---

1.    It appears that Green asserts that his punishment for abusing the TIPS program constituted racial discrimination, and that the Navy's subsequent actions constituted retaliation.  (Green's Resp. Winter's Mot. Summ. J. 2.)  Under this approach, Green would only analyze the events arising on December 11, 2005, June 30, 2006, and August 31, 2006, as instances of retaliation.

imposed on plaintiff on false charges of violating TIP was far more severe than the discipline imposed on non-black NAVCIP employees for allegedly violating TIP." (Id.)  Given these circumstances, Green argues the "undisputed facts provide ample direct evidence[2] to compel a reasonable jury to find defendant liable to plaintiff on his employment discrimination claim." (Id.)

To make out a *prima facie* showing of Title VII racial discrimination, Green must establish that: (1) he is a member of a protected class; (2) he was qualified for the position he sought; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably, *i.e.*, under circumstances giving rise to an inference of discrimination. See Tx. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000).

Once a *prima facie* case is established, defendant bears the burden of production, and must articulate some legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802.  If the defendant does so, plaintiff must prove that the defendant's purported reason is mere pretext, and that discrimination is the real reason.  Id. at 804-05.  To do this, Plaintiff must provide evidence casting "sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or allows the factfinder to infer that discrimination was more

---

2.  It appears that Green is arguing that there exists sufficient direct evidence to sustain his claim of racial discrimination.  In direct evidence cases, the employee alleging discrimination must produce "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."  Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989); see also Starceski v. Westinghouse, Inc., 54 F.3d 1089, 1097 (3d Cir. 1995).  This Court finds that Green has failed to provide any direct evidence, and as a result examines his claims under the McDonnell Douglas standard for establishing a *prima facie* claim of discrimination.

likely than not a motivating or determinative" basis for the adverse employment action.  Fuentes

v. Perskie, 32 F.3d 759, 759 (3d Cir. 1994); see also Atkinson v. Lafayette Coll., 460 F.3d 447,

454 (3d Cir. 2006) ("If the [employer advances a legitimate, non-discriminatory reason for its

action,] the burden shifts back to [Plaintiffs] to prove that the nondiscriminatory explanation is

merely a pretext for discrimination."); Frost v. PetSmart, Inc., Civ. A. No. 05-6759, 2007 WL

602990, at *3 (E.D. Pa. Feb. 26, 2007) (stating that if the defendant satisfies the burden of

production, the burden shifts back to the plaintiff to show the employer's stated reasons were

pretext for discrimination).

> To discredit the employer's articulated reasons, plaintiff

> > need not 'produce evidence that necessarily leads to the conclusion that the
> > employer acted for discriminatory reasons, nor produce additional
> > evidence beyond [her] *prima facie* case. Id. (citations omitted).  The
> > plaintiff must, however, point to 'weaknesses, implausibilities,
> > inconsistencies, incoherencies, or contradictions in the employer's
> > proffered legitimate reasons [such] that a reasonable factfinder could
> > rationally find them unworthy of credence and hence infer that the
> > proffered nondiscriminatory reason did not actually motivate the
> > employer's action.

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (quoting

Fuentes, 32 F.3d at 764).  Under this "pretext" method, the burden of proof lies at all times with

the plaintiff.

Looking at Green's claim that he suffered racial discrimination "in connection with false

charges related to Transportation Incentive Program," this Court finds that he fails to state a

*prima facie* claim of racial discrimination.  (Green's Mem. Opp. Winter.'s Mot. Summ. J. 2.)  It

is clear that Green satisfies prongs (1), (2), and (3).  But he fails to satisfy the fourth prong,

namely that "nonmembers of the protected class were treated more favorably."

Green was suspended for fourteen days because of his improper use of the TIP program.
He asserts that the Navy's treatment of "white employees was markedly different" than how it
treated him.  (Green's Mot. Summ. J. 10; Green's Resp. Winter's Mot. Summ. J. 4.)  In fact, he
notes that Captain Green "never disciplined a white employee at NAVCIP on false charges of
wrongdoing; according to M. Klein, plaintiff was the only employee issued a notice of proposed
removal for alleged violations of TIP."  (Id.)  Further, "the discipline imposed on plaintiff on
false charges of violating TIP was far more severe than the discipline imposed on non-black
NAVCIP employees."  (Id.)  Green argues that "[t]hese undisputed facts provide ample direct
evidence to compel a reasonable jury to find defendant liable to plaintiff on his employment
discrimination claim."

Despite these assertions, Green's claim must fail as he has not identified anyone similar
to him in circumstances.  "Common circumstances giving rise to an inference of unlawful
discrimination include the hiring of someone not in the protected class as a replacement or the
more favorable treatment of similarly situated colleagues outside of the relevant class."  Dawson
v. Harran, Civ. A. No. 08-7, 2009 WL 2431343, at *6 (E.D. Pa. Aug. 6, 2009) (quoting Bullock
v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999)).  The Dawson court noted
that a "similarly situated" individual is one who has "engaged in the same conduct as plaintiff,
'without such differentiating or mitigating circumstances that would distinguish their conduct or
the employer's treatment of them for it.'"  Id. (quoting Fullard v. Argus Research Labs., Inc., Civ.
A. No. 00-509, 2001 WL 632932, at *8 (E.D. Pa. June 6, 2001)).

The Navy instituted its investigation into abuses of TIP based upon an anonymous phone
call to a naval hotline.  (Winter's Mot. Summ. J. 6-7.)  This whistle-blowing phone call named a

number of people, including Green, who "were involved in the mass transit subsidy program that the caller had observed driving to work" in apparent violation of the program.  (Winter's Mot. Summ. J. 6-7, Ex. 20, Deposition of M. Klein ("Klein Dep."), Dec. 15, 2005 153:21-154:24.) An internal investigation found that four employees were abusing TIP.  (Id. at 155:6.)  The racial and gender identification of the four individuals is as follows: (1) African-American male (Green); (2) African-American female; (3) Asian female; and (4) Hispanic male.  (Id. at 155:15-17.)

When confronted about their TIP violations, the other three individuals were "very cooperative, very chagrined and . . . returned almost all of the vouchers that they had been issued during the period that they were supposed to be using the program, when, in fact, they were driving their car."  (Id. at 155:17-24.)  Removal of these three naval employees was not recommended as they "seemed to be very upset about it . . . and they returned the vouchers."  (Id. at 157:1-5.)  In contrast, Green "did not cooperate, in fact he lied . . . during the course of the investigation" and had only "returned about 300 out of $4,000 worth of vouchers."  (Id. at 160:10-14.)  For these reasons, his removal was recommended

Green fails to show that any non-African-American employee was treated preferably.  As a result, he must find an employee who has engaged in the same conduct as himself, such that it would not be possible to distinguish the Navy's treatment.  Green cannot provide such an employee.  White employees were only treated in manner that was "markedly different" than Green, because the Navy's investigation failed to find that any whites who had abused TIP. (Winter's Reply Br. in Support of Mot. Summ. J., Ex. 1, 116:16-19.)

Similarly, Green differs from the other minority employees, including one other African-American, who abused TIP because Green, unlike other TIP violators, neither showed contrition nor repaid the bulk of transit funds allocated to him.  The fact that no whites were punished and that the discipline of Green "was far more severe than the discipline imposed on non-black NAVCIP (*sic*) employees," in and of itself establishes nothing.  (Green's Mot. Summ. J. 10; Green's Resp. Winter's Mot. Summ. J. 4.)   Courts have routinely noted that citation to simple statistics, without any comparison, "is not enough to create a genuine issue of material fact at the prextext stage."  Folsom v. Sup. Ct. of N.J. Middlesex Vicinage, Civ. A. No. 06-1651, 2008 WL 1782236, at *10 (D.N.J. Apr. 17, 2008); see e.g., Bates v. MHM Corr. Servs., Civ. A. No. 05-228, 2008 U.S. Dist. LEXIS 9944, at *25 n.9 (M.D. Pa. Feb. 11, 2008) (noting that Plaintiff's claim that she was the only black employee and that 96.9% of her colleagues were white were offered in a "vacuum" and "do not indicate discrimination"); Hopkins v. Elizabeth Bd. of Educ., Civ. A. No. 03-5418, 2005 U.S. Dist. LEXIS 17031, at *15 (D.N.J. Aug. 4, 2005) (granting summary judgment because plaintiff's claim that he was the only African-American male Spanish teacher, absent more, did not sustain his claim of discrimination); Folsom, 2008 WL 1782236, at *10 (plaintiff's claim that he was the only African-American probation officer, even with other circumstantial evidence, was insufficient to withstand summary judgment).

Plaintiff has offered no evidence that he was treated differently because of his race.  After NAVCIP investigated all of its employees, only four individuals were determined to have violated the TIP program.  Of those four employees, Green was treated most harshly because he did not take responsibility for his actions.  Undermining his claim of racial bias, Green's punishment was not only more severe than the punishment given to "non-black" NAVCIP

employees, it was more severe than the punishment given to other black NAVCIP employees. Green was punished more severely than all other employees who were found to have violated TIP.  Green's argument is nothing more than an effort to establish an after-the-fact connection between his admittedly harsher punishment and the fact that he is African-American.  Under McDonnell Douglas, the threshold for creating a genuine issue of material fact is not a high one. Yet, Green fails to clear this threshold, and accordingly does not establish a *prima facie* case that his punishment for violating TIP was due to racial discrimination.

Assuming, for sake of argument, that Green has established a *prima facie* case of discrimination, the Navy must then articulate a legitimate, nondiscriminatory reason for its suspension of him.  McDonnell Douglas, 411 U.S. at 802.  If the Navy does so, Green must prove that the Navy's purported reason is mere pretext, and that discrimination is the real reason. Id. at 804-05.  To do this, Green must provide evidence casting "sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or allows the factfinder to infer that discrimination was more likely than not a motivating or determinative" basis for the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 759 (3d Cir. 1994); Atkinson v. Lafayette Coll., 460 F.3d 447, 454 (3d Cir. 2006) ("If the [employer advances a legitimate, non-discriminatory reason for its action,] the burden shifts back to [Plaintiff] to prove that the nondiscriminatory explanation is merely a pretext for discrimination.").

The Navy has provided a detailed explanation why it suspended Green for fourteen days including: (1) certifying, fraudulently, his monthly transit expenses; (2) certifying, fraudulently, that he did not have a worksite parking permit; (3) accepting transit vouchers during periods

18

when was not using mass transit; (4) failing to using public transit from July-September 2004

while receiving the transit subsidy; and (5) refusing to cooperate with NAVCIP's investigation

into TIP abuses.  (Winter's Reply Br., Ex. 1, Notice of Proposed Removal.)

When examining Green's transit practices, Ms. Klein noted that:

> I find your description of your commuting itinerary to be lacking
> and extremely vague since you were not clear on just how you did
> commute using mass transit.  You didn't know the routes and
> connections clearly and your story changed repeatedly.  I found that
> any of your described routines would be extremely time
> consuming, such that it would take you in excess of 2 ½ hours to
> travel.
>
> ****
>
> I was shocked by your 11 February 05 admissions that you used
> mass transit very infrequently, only when your health or family
> problems permitted, or not at all for periods of time.  I was equally
> shocked by your admission that, contrary, to your numerous
> certifications, that you only use mass transit when you are not sick
> or when you are not having family problems.  I found this
> convincing evidence that you did not use mass transit as your
> normal mode of daily commuting.
>
> ****
>
>  Additionally, I found that for the majority of the period from April
> 2004 through April 2005 that you were working 10-hour days on
> four days each week.  In order to complete your 10-hour days prior
> to the last departure time (1800 hours) in accordance with
> regulations you were required to being your shifts no later than
> 0730 hours.  The earliest regional rail commuter trains leave
> Delaware at 0550 hours and 0603 hours from the respective
> stations that you indicated departing from.  Taking either of these
> earliest trains available from Delaware only enables you to make
> connections that would put you near the NAVCIP compound after
> 0730 hours with a starting time well after 0730 hours even if every
> connection were met and ran perfectly on time.  0730 hours is the
> last starting time permissible in accordance with time/leave
> regulations for 10-hour shifts since all shifts are required to end on
> or before 1800 hours.  Since you could not complete your 10 hour

> tour of duty within the regulation time frame and your supervisor
> had no knowledge of any requests for a variance, you either were
> not commuting by mass transit and you were driving in order to
> arrive before 0730 hours or you were arriving after 0730 hours and
> were in violation of time and attendance regulations (since you did
> not account for any variances to your certified 10-hour shifts).

(Id. 7-8.)

In response to this evidence, Green argues that Winter's assertion that he abused TIP is a

"false and unsupportable claim" and that he "did not violate TIP but was suspended for 14 days

without pay on false charges that he violated TIP."  (Green's Resp. Winter's Mot. Summ. J. 5-6.)

 Such conclusory statements do not rebut the Navy's legitimate non-discriminatory basis for

suspending Green.  Instead, Green plays around at the margins quibbling with some of the details

alleged by the Navy in both its internal, disciplinary memoranda as well as its Motion for

Summary Judgment.  Specifically, Green disputes: (1) the dollar value of the transit credit

received; (2) whether or not TIP barred his driving to work; and (3) SEPTA's refusal to provide

him with receipts.  (Id. at 3-7.)  These arguments do not rebut the Navy's claim that he abused

TIP.  Rather, they seek to limit the significance of his abuses.[3]  As such, Green's arguments

neither rebuts Winter's Motion for Summary Judgment nor do they provide a factual basis

supporting his Motion for Summary Judgment.

---

3.   While disputing the value of his transit passes, Green does not dispute that monthly he falsely certified both his commuting expenses and that he relinquished his parking permit.  One can dispute the amount of benefit provided him, but examination of the record reveals that Green went months without using mass transit while receiving transit vouchers.  The regulations permit TIP to work, but if they do so they must "calculate costs on a pro-rated basis." (Green's Mot. Summ. J., Ex. A, TIP Program Guidelines p.12(f).)  Green never pro-rated his transit costs.   The record clearly indicates suggests that Green drove far more often than he took mass transit—witness the July - September 2004 time frame—when he allegedly never took mass transit.  Yet, at no time did he pro-rate his TIP subsidy.  Green was able to abuse TIP in manner because contrary to his monthly representations he still possessed a valid worksite parking permit.

Green has provided no evidence suggesting that the Navy's stated reasons were pretextual

justifications when in actuality it was motivated by discriminatory animus.  Instead, the Navy

carefully documented its findings.  In the Navy's Decision, Captain Wiechelt stated that:

> I found by your own admission that you did not utilize mass transit
> for commutation in June 2004, December 2004, or in January
> 2005, regardless of whether or not you may have bought a transit
> fare pass for those months.  You stated that all of your
> certifications made in conjunction with TIP are true.  However, I
> found by your admission you did not at all adhere to at least one
> certification made repeatedly that "I will be using it [TIP subsidies]
> for my regular daily commute to and from work."  You stated
> several times that the TIP did not prohibit use of cars nor say that
> you were required to report the use of your car.  You are correct,
> there is no prohibition on driving occasionally.  However, to not
> having certified your commuting expenses accurately, your benefit
> generally exceeded your actual mass transit costs (both paid for and
> utilized).
>
> ****
>
> You stated that you never refused to pay the government, you
> stated several times that you didn't owe the government anything.
> I found that denial incorrect in light of some of your admission of
> non-usage and your failures to account for subsidies, including the
> $120 in excess vouchers that you admitted to.  You stated that you
> had arrangements with all your prior supervisors with respect to
> your participation in the TIP and commuting by mass transit.  Not
> one of your most recent three supervisors had an agreement with
> you regarding special consideration such as late arrivals and late
> shift completion.  You stated that you used train 15 times a month.
> However, I found no evidence in the past 5 quarters where that was
> even feasible.
>
> ****
>
> You stated that you usually bought monthly passes, but you didn't
> keep the receipts or old passes.  However, when the Accounting
> Director first interviewed you on 11 February 2005, you were put
> on notice as to the expectation of daily commuting by mass transit

and of the expectation that you verify your current commutation by mass transit. Yet, you could not or would not produce monthly passes for February 2005, March 2005 or April 2005 following my indication to you that verification of fare medium utilized would be very convincing. I also found your negative response to Margaret Klein's request for April 2005 fare pass verification during the month of April 2005 to be compelling, since that request did not involve receipts or expired passes.

\*\*\*\*

I find that each quarter in which you received the TIP benefit, you certified the following "I am not named on a worksite parking permit with DOD." You stated in your replies that you did not violate any provisions of the TIP and that all of your certifications made in conjunction with the TIP are true. You stated several times that the TIP did not prohibit the use of cars and that your use of your vehicle and parking on the base or around the base were justified and legitimate. You never challenged or refuted that your vehicle had a permit and you indicated that the Navy recently sought removal of the vehicle decals so by implication it must have been appropriate. I find that this position does not change the fact your numerous certifications regarding not being named on a worksite parking permit was not accurate.

(Winter's Mot. Summ. J., Ex. 14, Decision on Proposed Removal ¶¶ (3(a)-(c),(g), 4(a).)

For the reasons stated above, summary judgment is granted as to Green's claim that the Navy's punishment of him for violating TIP was based on racial discrimination.

The Court next analyzes the four instances raised in Green's Complaint for evidence of racial discrimination.

**b.    There is no Evidence that the Navy's December 11, 2005 Transfer of Green Was Based Upon Racial Discrimination**

Green asserts that upon returning from his fourteen-day suspension, he, an accountant, was involuntarily transferred to a "non-accounting position in the Inventory Accuracy Department." (Compl. ¶ 14.)  Specifically, on November 15, 2005, Comptroller Directorate

Margaret Klein proposed that "Green be transferred from an accounting position in the material

accounting department to an accounting position in the inventory accuracy organization."

(Winter's Mot. Summ. J. 8, Ex. 17, David Green Reassignment.)  This transfer was proposed for

three reasons: (1) because NAVCIP was seeking to promote efficiency within its inventory

accuracy function which required "a skilled accountant with a background in Inventory Data

Base Analysis Division;" (2) given Green's improper certification of his transit funds

"management has decided it would be inappropriate to allow Mr. Green to certify funds;" and (3)

Green's position was being backfilled because the "current workload can be reallocated."  (Id.,

Ex. 17, David Green Reassignment.)

On December 11, 2005, Captain James Davis transferred Green to the inventory accuracy

division.  (Id., Ex. 16, Deposition of James Davis ("Davis Dep.") 15:10-16:23) (noting that

Green "lost the confidence of his supervisor.") .)  This transfer did not affect Green's pay, job

series, job grade, benefits, or advancement opportunities.  (Id., Ex. 17, David Green

Reassignment.)  Further, the Navy asserts that Green was transferred both to fill a legitimate

workplace need, and "to move him to an accounting position where he would not be responsible

for certifying the Navy's funds."  (Id. at 7.)

The Navy argues that Green's claims regarding his transfer to the Inventory Accuracy

Division are barred by his failure to fully exhaust his EEO grievance procedures.  Exhaustion of

all administration remedies is a predicate to the filing of a Title VII suit.  See Brown v. Gen.

Servs. Admin., 425 U.S. 820, 832-833 (1976).  As this Court has noted previously, Green "is

familiar with the process and procedures required of federal employees who believe that they

have been victims of improper workforce discrimination." Green v. Winter, Civ. A. No. 07-

2640, 2008 WL 5273579, at *5 (E.D. Pa. Dec. 19, 2008).

Federal Regulations provide that:

> [a]ggrieved persons who believe they have been discriminated
> against on the basis of race, color, religion, sex, national origin, age
> or handicap must consult a Counselor prior to filing a complaint in
> order to try to informally resolve the matter. An aggrieved person
> must initiate contact with a Counselor within 45 days of the date of
> the matter alleged to be discriminatory or, in the case of a
> personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105(a)(1).

This forty-five day period runs "when the Plaintiff knows or reasonably should know that

the discriminatory act has occurred." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d

1380, 1386 (3d Cir. 1994). Applying the "discovery rule," the Third Circuit noted that the

accrual of a claim is governed by the "discovery rule," and that a claim accrues upon "awareness

of actual injury, not upon awareness that this injury constitutes a legal wrong." Id. at 1386.

Awareness of an injury occurs when a plaintiff knew or should have known of the injury and that

the injury had been caused by another party's conduct. Id.; see also Dixon v. Dalton,985 F.

Supp. 584, 586 (E.D. Pa. 1997) (holding that the forty-five day time period for contacting a

counselor began running when plaintiff learned that she had not been selected for a position.)

The Regulations do not require that an aggrieved federal employee file an EEO

complaint, but rather they are required to contact "a Counselor within 45 days of the date of the

matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a). Green was transferred from

material accounting to the inventory accuracy department on December 11, 2005. The forty-five

day time period began running at that time. Yet, Green did not contact an EEO counselor until

24

July 15, 2006.  (Winter's Mot. Summ. J., Ex. 7, July 15, 2005 Green fax to EEO Counselor.)

Given this, 215 days passed before he contacted his EEO Counselor.  (See Id., Ex. 27, Affidavit

of EEO Counselor Rachel Brown.)[4]  Under the discovery rule, it is clear that Green was aware

that he suffered an "actual injury" at the time of his transfer.[5]

        In addition to addressing the discovery rule, Oshiver also addresses its converse:

equitable tolling which stops the running of the forty-five day clock.  38 F.3d at 1390.  The Third

Circuit has recognized the availability of equitable tolling in at least three situations: "(1) where

the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where

the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3)

where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."  Id. at

1387.  None of these situations are applicable to the present case.  While Green asserts that he

was transferred due to discrimination and retaliation, he has provided no evidence that he was

misled about the Navy's stated rationale.  Although he may disagree with that rationale, there is

no indication that he accepted that rationale until at some latter point when he suddenly realized

that racial animus was actually guiding the Navy's decision.  Likewise, it is clear that Green was

---

4.  Brown in her affidavit states:

> Mr. Green's DON 06-0391-01919 complaint began on
> Saturday, July 15, 2006, when he first contacted me by fax
> regarding his allegation that he was reassigned from the
> materials accounting division to the inventory accuracy
> division due to his race (African-American) and/or in
> retaliation for his past EEO complaints.  Mr. Green sent a fax
> from his home while he was on paid administrative leave.

(Winter's Mot. Summ. J., Ex. 27, Affidavit of EEO Counselor Rachel Brown ¶ 5.)

5.  The Court assumes for sake of argument that a transfer to a new position resulting in no diminution in pay, benefits, or advancement opportunities constitutes an "injury."

neither prevented from asserting his rights nor did he mistakenly file his Complaint in another, incorrect forum.  Green did not comply with the forty-five day requirement, and as such, any claim regarding his transfer to the inventory accuracy department is barred given his failure to exhaust the Navy's administrative procedures.

**c.**     **There is Evidence that the Navy's June 30, 2006 Notice of Proposed Removal Was Issued Because of Racial Discrimination**

Green's claim that the Notice of Proposed Removal was issued due to racial discrimination appears to rest upon his belief that Richard Dembowski, his supervisor, sought to procure his removal because he was black.  Yet, the record fails to establish any evidence supporting this claim.  See Sarullo v. U.S. Postal Serv. 352 F.3d 789, 798 (3d Cir. 2003) (noting that plaintiff's assertion of a *prima facie* case of racial discrimination failed because he did not "establish some causal nexus between his membership in a protected class and the decision to not rehire him.")  Green's "evidence" of causation consists of his own assertions—made in affidavits, depositions, and court filings.  Such evidence is insufficient to sustain a *prima facie* case as Green provides no evidence that the Navy's actions were motivated by racial animus.[6]

---

6.  Green suggests that Dembowski's true motives are evidenced in comments he made toward Green which reveal a lack of respect for African-American employees.  (Id., Ex. 1, Green Dep. 21:20-21.)  Examples of such behavior include Dembowski: (1) stating to Green that "I'm going to get you;" (2) interrupting Green on the phone; and (3) shouting at him, repeatedly.  (Id., Ex. 1, Green Dep. 21-25, 66.)

                    Examination of the record indicates that Green could offer little in the way of specific examples of such behavior:

Q. Could you give me an example of how Mr. Dembowski treats his black employees without respect.

\*\*\*\*

A. The only one I can recall at the present time, I'm talking to my wife on the phone, and Mr. Dembowski utters some remarks.  That's the only thing that I can remember at the present time.
Q. When did this occur?

(continued...)

26

Even assuming that Green has stated a *prima facie* case of discrimination, his claim must fail as the Navy, via its extensive June 30, 2006 Notice of Proposed Removal, carefully details his workplace intransigence and misbehavior since his transfer to the inventory accounting department.  (Winter's Mot. Summ. J., Ex. 23, Notice of Proposed Removal.)  Green does not attempt to rebut the allegations provided in the Proposed Removal.  This Court finds that these extensive details, documenting Green's workplace behavior "support a finding that unlawful discrimination was not the cause" for the Navy's Notice of Proposed Removal.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

Despite the extensive recording of his disrespectful, threatening, and disruptive behavior, Green insists that these details and the reasons offered by the Navy "were not its true reasons, but

---

6.  (...continued)
A. I don't recall.
Q. Was there anybody around that saw this?
A. I don't recall.

****

Q. So is it your testimony at the present time that you can't recall any examples of how Mr. Dembowski talks to African-American employees which shows that he treats them like slaves?
A. Repeat that, please.
          (The requested information was read back by the court reporter.)
                    BY MS. MARK
A. At the present time, I don't remember all details.
Q. So the answer to my question is yes?
A. Yes, it is, yes.

****

Q. I'm sorry was Mr. Dembowski's statement "I'm going to get you" based on your past EEO complaints, or was it based on your race, or was it based on both?
A. On both.
Q. Okay.  So the first question is, how was Mr. Dembowski's statement "I'm going to get you" related to your race?
A. At the present time, I can't recall the details on that situation.

(Winter's Mot. Summ. J., Ex. 1, Green Dep. 21:14-23:4, 24:17-27:22, 28:10-24, 29:17-23, 65:24-66:9.)

          Absent more, Green's evidence consists of assertions that when viewed in light most generous to him provides no evidence of racial bias.  A most generous reading of Green's assertions suggest that Dembowski was at times rude to Green.

27

were a pretext for discrimination."  Burdine, 450 U.S. at 253.  Given the lack of evidence

supporting Green's assertion, he fails to state a claim warranting relief.

> **d.      There is No Evidence that Either the Navy's Placement of Green on Thirty Days Administrative Leave or His August 31, 2006 Termination Were Based Upon Racial Discrimination**

Like with his other claims, Green has failed to provide any evidence that he was either

placed on thirty-day administrative leave or terminated due to racial bias.  When asked at his

deposition, "[w]hy did Mr. Dembowski place you on administrative leave for 30 days in June

2006," Green stated, "I don't recall or remember."  (Winter's Mot. Summ. J., Ex. 1, Green Dep.

155:13-15.)  Counsel followed up asking: "Q. Do you think that Mr. Dembowski's placing you

on administrative leave for 30 days in 2006 was discriminatory based on your race?

A. I don't recall or remember."  (Id. at 156:4-7.)

Accordingly, Green has failed to provide any basis for suggesting that racial discrimination

played any role in his being placed on thirty-day administrative leave.  Rather, placement on

thirty-days administrative leave follows directly from the Notice of Proposed Removal which

provides that, "[t]his proposed action, if found warranted, will be effected sometime after the

thirty-day advanced notice period has expired.  You will not be permitted to enter the compound

during this period."  (Id., Ex. 23, Notice of Proposed Removal § 6.)  There is no indication that

this thirty-day period was arbitrary or unique to Green.  Rather, this advanced notice period is

standard Navy procedure.  Naval regulations provide that notices of proposed action

> will inform the employee of the basis for the proposed adverse
> action, the length of the notice period, (normally, 30 days, except
> when effecting indefinite suspensions or invoking the crime
> provision), the right to reply in writing and/or in person, the time
> allowed for a reply, and the person to whom the reply must be

> directed, entitlement to representation and official time, if
> appropriate, right to review the case file, etc., and the fact that a
> written decision will subsequently be issued.

(Id., Ex. 24, Dept. of Navy Joint Instruction 12750.1E (4)(a).)  Thirty days is the standard time-frame that permits responses and facilitates a careful and independent review of a decision to terminate a federal employee.

Similarly, Green has failed to sustain a claim that he was fired based on racial discrimination.  Examination of Green's deposition testimony provides no evidence suggesting that his August 31, 2006, termination was based on racial discrimination.  Specifically, when asked by the Government's counsel why he was terminated he stated, "[r]etaliation for the EEO Complaints."  (Id., Ex. 1, 30:17-18.)  This statement is consistent with Green's subsequent response to counsel's questioning: "Q. Why do you think your termination was based on your race?  A. Because a direct — it was retaliation for my EEO involvement."  (Id., at 181:11-14.) Given the absence of any evidence suggesting that Green was terminated on account of his race as well as Green's failure to challenge any of the legitimate reasons proffered for his firing, it is clear that he has failed to provide evidence sufficient to withstand summary judgment.

## 2.    Analysis of Green's Retaliation Claims

As he made clear in both his deposition testimony and his reply briefs, Green believes that the Navy's actions toward him, after returning from suspension, constitutes retaliation.  Title VII's anti-retaliation provision states:

> [i]t shall be an unlawful employment practice for an employer to
> discriminate against any of his employees .. . because he has
> opposed any practice made an unlawful employment practice by this

> subchapter, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Like with racial-discrimination claims, courts examining retaliation

claims utilize the McDonnell Douglas burden-shifting approach whereby the court looks to see

whether plaintiff has stated a *prima facie* case for retaliation, which entails proof of three

elements: "(1) [Plaintiff] engaged in activity protected by Title VII; (2) the employer took an

adverse employment action against [him]; and (3) there was a causal connection between [his]

participation in the protected activity and the adverse employment action."  Moore v. City of

Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (applying the McDonnell Douglas framework in

retaliation case) (citation omitted); see also Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir.

2007).

 To withstand summary judgment, "the plaintiff's evidence rebutting the employer's

proffered legitimate reasons must allow a factfinder reasonably to infer that each of the

employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise

did not actually motivate the employment action."  Fuentes, 32 F.3d at 764 (internal quotations

and citations omitted).  As such, "the non-moving plaintiff must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of

credence."  Id. at 765 (internal quotations, citations, and emphasis omitted).  Unlike in

discrimination claims, the Third Circuit has noted that the scope of a retaliation claims may

extend beyond actions "that affect the terms and conditions of employment."  Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006).

With retaliation claims, the "ultimate question . . . is an intent to retaliate *vel non*." Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006). To help in this analysis, courts have looked at the temporal proximity between a plaintiff's protected activity and the employer's purportedly retaliatory response, and events in the intervening period. Marra v. Phila. Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007). As Green correctly asserts, the absence of temporal proximity is not sufficient to overcome a claim of retaliation. (Green's Resp. Winter's Mot. Summ. J. 5.) Rather, "[t]he mere passage of time is not legally conclusive proof against retaliation." Marra, 497 F.3d at 302 (quoting Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir. 1993) (citation omitted)); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). Resultingly, when there is a gap between protected activity and the alleged retaliation, courts are to examine specific actions taken in the interim. Such actions may include but are not limited to "actual antagonistic conduct or animus against the employee." Marra, 497 F.3d at 302.

Green has filed numerous EEO complaints and such filings constitute protected activity. Nonetheless, his retaliation claims fail because: (1) he has not exhausted his claim; and because (2) he has failed to provide a causal connection between the protected activity and any of the alleged retaliatory events. The Court discusses each claim individually.

      a.      **Green Failed to Properly Exhaust His Claim That His Transfer Was Retaliatory for His EEO Filings**

As discussed previously, the Government has argued that Green's racial discrimination based on his transfer should be dismissed as he did not follow the required administrative procedures.  It is essential that internal grievance procedures be exhausted prior to the filing of a suit.  Yet, Green, a repeat filer of such claims, failed to follow the Navy's internal grievance procedures when he did not contact an EEO counselor within forty-five days of his learning that discriminatory action had occurred.  Green learned of his transfer on December 11, 2006.  It was at this time that he should have reasonably known that a discriminatory act had occurred, yet he waited two hundred fifteen days before contacting an EEO counselor.  For this reason, Green's claim that his transfer was retaliatory in nature is time-barred.

### b.   Green Provides No Causal Nexus Between his 2005 EEO Filing and the Navy's Notice of Proposed Removal

Still he asserts that the Navy's June 30, 2006 Notice of Proposed Removal was in retaliation for this EEO filing.[7]  Green alleges that Dembowski made several rude statements toward him including,  "I'm going to get you."  (Winter's Mot. Summ. J., Ex. 1, Green Dep. 63:7-17.)  Even if Dembowski made such statements, something the Navy disputes, Green cannot establish a *prima facie* case of discrimination because he cannot show that Dembowski knew of his prior protected activity.  Absent such a connection between his prior protected activity and Dembowski's comments, Green is unable to establish the necessary causal connection establishing retaliation.  See Iyer v. Ever, Civ. A. No. 06-1539, 238 Fed. Appx. 834, at *2 (3d Cir. Aug. 3, 2007) (finding that summary judgment was appropriate as plaintiffs failed to establish that

---

7.  Green may believe that the Navy is also retaliating against him for his 2002 EEO filing, or other EEO filings, but the fact is that he does not specify whether a specific filing or all his filings, taken together, are the basis for the Navy's retaliatory actions.

his supervisor knew of his EEO filings); Sarullo, 352 F.3d at 801 (stating that plaintiff "has

provided no evidence to rebut Brown's declaration that he was unaware of Sarullo's prior EEO

activity when he made his decision not to reinstate Sarullo.  Thus, the District Court properly

granted summary judgment.").

    Dembowski asserts that at the time he issued Green's Notice of Proposed Removal, he did

not know that Green had made prior EEO filings with the Navy.  Specifically:

> Q. Mr. Dembowski, were you aware of Complainant's previous
> EEO activity?  And what I mean by EEO activity, in Mr. Green's
> testimony, he stated that he had prior EEO complaints.  He had a
> previous Notice of Proposed Removal.  He had a denial of
> promotion to a GS12.  In 1998, he had agreed to a settlement based
> on a previous EEO complaint.  In addition, he had had a 14-day
> suspension in 2005 with an EEO appeal.  Were you aware of any of
> those incidents?
>
> A. No, I was not.
>
> Q. Okay.  So, other than this particular complaint that we have here,
> you had no knowledge of anything prior to the incidents that are in
> this acceptance letter?
>
> A. I had no knowledge of him filing EEO complaints.  I knew there
> were things going on.
>
> Q. Okay.
>
> A. Okay.  I mean, the investigation with the mass transit things,
> there were a lot of people suspended –

(Winter's Mot. Summ. J., Ex. 1, Green Dep. 67:19:68:16.)  As the Navy notes, Green was asked,

four times, who in management made comments about his EEO filings.

> Q. Do you remember any of the managers who made comments
> about your EEO complaints while you were employed at the
> Department of Navy?

A. The only one I can recall at the present time is Ronald Stein, and I can't think of the guy's name I think it was William Vera, William Vera.

Q. Can you think of any other names of people who made comments about your EEO Complaints while you were employed at the Navy?

A. Not at the present time.

(Id., 17:2-13.)  When pressed further about what Mr. Stein said to him, Green replied, "what he basically said was – I can't remember exactly, but he just made negative remarks, something like – I can't remember exactly, but I remember a comment saying something like I had disdain for management."  (Id. at 17:17-21.)  When asked about Mr. Vera's remarks Green said that: "[t]he only thing I can recall is he made a comment that I was just complaining.  Q. Do you recall anything more specific about that?  A. That's all I can remember at the time.  He said I was complaining to one of my co-workers."  (Id. at 18:12-18.)

Green was subsequently asked: "Q. Are there any other comments, other than the two we just talked about, about your filing EEO complaints that you can recall?  A. Nothing else I can recall at the present time."  (Id. at 21:8-13.)  During subsequent questioning, Green was again asked about Dembowski's retaliation for his filing EEO Complaints:

Q. How is Mr. Dembowski's statement "I'm going to get you" related to your past filings of EEO complaints?

****
A. All I can recall is, he brought it up.

Q. But how is that related to your past filing of EEO complaints?
A. He brought it up.  He brought it up.   He brought up the situation.
I recall basically – what I can remember at the present time is that

34

> he mentioned in the conversations, he brought up the previous
> situations.
>
> Q. What situations did Mr. Dembowski bring up?
>
> A. The EEO complaints and other situations.  The same thing, just
> say EEO stuff.

(Id., 67:7-68:2.)

Green's own testimony makes, at most, a tenuous connection between his prior EEO

filings and the comments of his managers.  Green's account of statements by Stein and Vera

indicate that they said nothing about his EEO filings, referring only to his workday, workplace

complaints to colleagues.  These remarks evidence no connection to Green's EEO filings.

Green's statement about Dembowski mentioning the "EEO complaints and other situations" in

conversation also fails to create a causal connection between protected activity and adverse

actions.  Green does not suggest that Dembowski threatened him, spoke ill of any prior events or

actions, or that they served as a basis for his Notice of Proposed Removal.  Green repeatedly

asserted in his deposition testimony that Dembowski did not talk to him with respect, that he

uttered comments, or screamed at him.  Yet, it was not during these allegedly heated moment that

comments about "EEO filings and other situations" arose.  It was during "conversations."  There

is no evidence that these comments were anything more than efforts by a manager to discuss work

with an employee under his supervision.

As such, Green has failed to establish a *prima facie* case because he has failed to show any

causal nexus between his prior protected activity and the adverse action.  Assuming, for sake of

argument, that Green has established a *prima facie* case of retaliation, his claim must still fail

since the Notice of Proposed Removal provides clear evidence of legitimate, non-discriminatory reasons for proposing Green's severance from federal employment.  In writing this Notice, Dembowski provided detailed, chronological accounting of Green's unexcused absences, his disrespect for authority, and his oppositional behavior.  At no time does Green attempt to dispute the facts or the time line of events in the Notice.  Rather, Green relies on the conclusory statement that the Notice of Proposed Removal was issued in retaliation for his filing of EEO complaints.  Absent more, such a claim cannot withstand summary judgment.

> ### c.    Green Provides No Causal Nexus Between his Thirty Days of Administrative Leave and Retaliation

Green also claims that his placement on thirty days of administrative leave constituted retaliation for his prior EEO filings.  The evidence provided to this Court, however, fails to make a *prima facie* claim of retaliation.  In fact, Green's own deposition testimony undermines his retaliation claim.  When asked about why Dembowski placed him on administrative leave, he stated:

> A. I don't remember or recall.
>
> Q. Can you give me a reason or explanation of how Mr. Dembowski placing you on administrative leave for 30 days in 2006 is retaliation?
>
> A. I don't remember or recall.
>
> Q. So isn't it correct that sitting here today, you can't provide me with an explanation of a reason of how Mr. Dembowski placing you on administrative leave for 30 days is related to you – is retaliation?
>
> A. At the present time, I can't remember or recall.

(Id. at 157:12-158:5.)  Green's own testimony undermines a retaliation claim.

36

Nonetheless, even assuming for sake of argument that Green has stated a *prima facie* case, the Navy has met its burden and provided a legitimate non-discriminatory reason for the imposition of a thirty-day administrative leave—namely that its regulations require such a period. (See, id., Ex. 24, Joint Instruction 12750.1E.)  The Navy clearly stated that the administrative leave was instituted while the Proposed Notice was being reviewed.  (Id., Ex. 23, Notice of Proposed Removal § 6.)  Administrative leave automatically followed from the Notice of Proposed Dismissal.  As there is no connection between Green's protected actions and the Notice of Proposed removal, it follows that there can be no nexus between his protected action and the thirty-day administrative leave.  Accordingly, Green has failed to state a *prima facie* case of discrimination.

> **d.**      **Green Provides No Causal Nexus Between his Removal and Retaliation**

As with his other claims of retaliation, Green has failed to provide the necessary factual basis for establishing a causal connection between his EEO filings, and the Navy's decision to terminate him.  Ten months passed between Green's 2005 EEO filing and his termination.  During this time period Green was repeatedly admonished and disciplined for his workplace behavior.  Such routine discipline cannot constitute evidence of retaliation and discrimination, otherwise, the mere act of contacting an EEO counselor would immunize employees from discipline for workplace infractions.  Instead, proof of retaliation —when there has been a lapse between protected activity and retaliation—requires evidence of animus or antagonistic behavior in the interim.  Green has provided no such evidence.

Green argues that Captain Davis was biased and should not have presided over the decision to remove him from the Navy.  Green does not explain the source or basis for this bias.  Assuming Captain Davis' knowledge of Green's prior EEO filings, this knowledge is not sufficient to create a causal connection between Green's protected activity and his firing.  As Comptroller of NAVCIP, Captain Davis was likely aware of all EEO filings at NAVCIP.  Such knowledge (which has not been shown in the present case), absent more, is not sufficient to sustain a *prima facie* case of retaliation.

Even assuming, for sake of argument, that Green has proven a *prima facie* case that his firing was retaliatory in nature, his claim must fail as the Navy has articulated legitimate, non-discriminatory reasons for its decision to fire Green.  Captain Davis, in his Decision on Proposed Removal, examined the basis for the Navy's decision to fire Green:

> You stated in your written reply that 'there are many false statements in Mr. Dembowski's June 30, 2006 Notice of Proposed Removal.'  Your notice of proposed removal contains very specific and serious specifications that are supported by written documentation on the record.  Your assertion that many of these statements are false does not identify which of the statements you claim to be false or provide your version of the events.  Similarly, you summary denial of the charges does not provide any alternative explanation for the events described in the proposed notice, nor have you offered any evidence to support your challenges of the charges.
>
> ****
>
> You did not present an oral reply and your written reply amounted to a summary denial of the charges without specificity or evidence to support your statements.  You did not persuade me that there are any mitigating circumstance.

(Id., Ex. 15, Decision on Proposed Removal ¶¶ 6(a), 7(c),(d).)  As such, Green has failed to articulate any basis in evidence supporting his assertion that he suffered the decision on removal was in retaliation for his EEO filings.  Rather, upon review, the Navy affirmed the allegations provided in the Notice of Proposed Removal.  Navy policy recommends removal of employees who have three disciplinary infractions.  (Id., Ex. 24, Joint Instruction 12750.1E 6.)  The record shows that Green engaged in at least three disciplinary infractions and was written-up three times for misbehavior.  This underscores that Green was not subject to retaliation, but was treated in accord with naval policy.

**B.**   **Green's Motion for Summary Judgment**

In filing his Motion for Summary Judgment, Green makes several assertions that he believes mandates an entry of summary judgment on his behalf namely that he was suspended on "false charges of violating TIP," and NAVCIP's treatment of "white employees was markedly different [as] no whites were discipline for alleged violating TIP was far more severe than the discipline imposed on non-black NAVCIP employees."  (Green's Mot. Summ. J. 10.)  Green concludes that these facts "provide ample direct evidence to compel a reasonable jury to find defendant liable to plaintiff on his employment discrimination cause of action.  Thus, they justify an order granting summary judgment to plaintiff on his employment discrimination cause of action."  (Id.)  Green makes the identical argument regarding his retaliation claim.  (See Id. at 11.)

As noted above, Green has failed to provide any evidence of racial discrimination or retaliation, let alone enough evidence to warrant summary judgment.  Accordingly, the Court denies this motion.

**C.**   **Winter's Cross-Motion for Summary Judgment**

In response to Green's Motion for Summary Judgment, Winter filed a Cross-Motion for Summary Judgment to address "the new claims plaintiff raises for the first time in his motion." (Winter's Cross-Mot. Summ. J. 3.)  This Cross-Motion seeks to respond to Green's discussion of his May 2005 EEO filing which Green believes led to his fourteen-day suspension for violating TIP, his transfer, and termination.  (Green's Mot. Summ. J. 9.)  Winter argues that Green fails to meet Title VII's administrative requirements as "Green failed to file a Complaint in federal court within ninety days of receipt of his January 27, 2008 right to sue letter on these claims."  (Winter's Cross-Mot. Summ. J. 5.)

A Final Agency Decision and right-to-sue letter regarding Green's October 2005 and September 2006 EEO filings was issued on December 6, 2007.  (Id. at 6.)  Green filed suit on January 8, 2008, well within the ninety days provided for by statute.  See 42 U.S.C. §2000e-16(c). Resultingly, Green's Complaint appropriately references his October 2005 EEO filing which discussed in his Motion for Summary Judgment.  The Complaint makes no mention of Green's May 2005 EEO filing.  (See Compl. ¶ 12.)  This is likely due to the fact that when Green filed his January 8, 2008 Complaint, his May 2005 EEO filing was under administrative review.  (Winter's Cross-Mot. Summ. J. 8.)  A Final Agency Decision and right-to-sue letter regarding both the May 2005 EEO filing and his July 2005 Notice of Proposed Removal was issued two weeks later on January 23, 2008.  (Id.)

Green did not timely file a federal complaint after receiving his January 23, 2008 right-to-sue letter and as such did not comply with the requirement that suit be filing within ninety days of receiving such a letter.  This Court declines to grant Winter's Motion of Summary Judgment because Green's Complaint, does not address his May 2005 EEO filing or the July 2005 Notice of

Proposed Removal.[8]  This Court does not have jurisdiction to hear any claims based on the May

2005 EEO filing or the July 2005 Notice of Proposed Removal.  As such, Winter's Cross-Motion

for Summary Judgment is dismissed.

## IV.      CONCLUSION

For the reasons discussed above, Winter's Motion for Summary Judgment is granted.

Green's Motion for Summary Judgment is denied, and Winter's Cross-Motion for Summary

Judgment is dismissed as moot.

An appropriate Order follows.

---

8.  The Court notes that it does analyze the July 2005 Notice of Proposed Removal in detail as this Notice addresses the Navy's basis for its findings that Green violated TIP.  This Notice supports Winter's argument that racial discrimination did not motivate Green's punishment for abusing TIP.